**FOURTH DIVISION**
**DOYLE, P. J.,**
**MCFADDEN and BOGGS, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**November 21, 2013**

# In the Court of Appeals of Georgia

A13A0988. DOSS & ASSOCIATES v. FIRST AMERICAN TITLE
    INSURANCE COMPANY, INC.

A13A0989. FIRST AMERICAN TITLE INSURANCE COMPANY
    v. DOSS & ASSOCIATES.

A13A0990. GEROVA ASSET BACKED HOLDINGS, L. P. v.
    DOSS & ASSOCIATES.

BOGGS, Judge.

This case arises from a $4.75 million loan from Stillwater Asset-Backed Fund,

LP ("Stillwater")[1] to Cohutta Water, Inc. Steve Carroll, Cohutta's president and CEO,

guaranteed the loan and executed a security deed for seven parcels of real estate to

secure it. Stillwater did not obtain a first position lien on one of the tracts (48.2 acres)

due to a prior encumbrance held by Branch Banking & Trust ("BB&T") for a

---

[1] Stillwater later changed its name to Gerova Asset Backed Holdings, L. P. ("Gerova"). Because all of the relevant documents and the parties' briefs refer to Gerova as Stillwater, the opinion will also refer to Gerova as Stillwater.

personal loan to Carroll. In 2008, Cohutta defaulted on the Stillwater loan, and Carroll breached the guaranty and filed for bankruptcy. In 2009, BB&T foreclosed on the 48.2 acre tract and paid $1 million as the highest bidder; the total principal amount of the BB&T loans secured by the property was $910,831.00. Stillwater received $5.6 million from the foreclosure sale of the remaining six lots securing Carroll's guarantee.

Stillwater subsequently sued the closing attorney and title agent for the loan, Doss & Associates ("Doss"), as well as First American Title Insurance Company, Inc. ("First American"), claiming it should have received a first-position lien on the 48.2 acre tract in the closing and seeking damages. First American asserted a cross-claim against Doss for contractual indemnity and professional negligence.

In Case No. A13A0988, Doss appeals from the trial court's grant of partial summary judgment in favor of First American on its contractual indemnity claim, asserting that it was premature for the trial court to rule upon the claim and that it cannot be held liable for an insurer's bad faith failure to pay a claim. In Case No. A13A0989, First American cross-appeals from the trial court's order denying summary judgment in its favor, claiming it cannot be held liable for Stillwater's interest, costs, and attorney fees associated with the loan, that Stillwater cannot prove

a bad faith claim, and that Doss should be required to indemnify it for its attorney fees. In Case No. A13A0990, Stillwater appeals from the trial court's order granting summary judgment in favor of Doss on Stillwater's claim for breach of an alleged oral escrow agreement.[2] For the reasons explained below, we affirm in Case No. A13A0988; affirm in part and reverse in part in Case No. A13A0989; and reverse in Case No. A13A0990.

### Case No. A13A0990

In its sole enumeration of error, Stillwater contends that the trial court erred by failing to conclude that genuine issues of fact exist as to whether an oral escrow agreement existed between it and Doss in connection with the closing of the $4.75 million loan. We agree and therefore reverse.

The record shows that on December 14, 2006, Stillwater's counsel in New York, Allison Prouty, orally requested that Doss execute an escrow agreement in connection with the closing. No later than the morning of December 20, 2006, Doss provided Stillwater's counsel with a form escrow agreement to Stillwater's counsel that had been obtained from a "form library" on a First American website.

---

[2] Based upon the trial court's ruling, Stillwater's claim based upon Doss' breach of a closing protection letter remains pending below.

3

At 11:28 a.m. on December 20th, Prouty sent an email to Michelle Tipton, a paralegal at Doss, thanking her for sending a "form of escrow agreement" in addition to other documents. Prouty requested that Doss prepare an escrow agreement for her firm "with all the normal provisions pertaining to any escrow agreement" in order for Stillwater "to wire loan proceeds into your firm's escrow account." She also stated:

Escrow Agreement:

Specific to language in the title company's brief form you sent, you need to list, after "as follows:" at the end of the first paragraph, the prior liens, taxes and title premiums and recording charges to be paid off at closing. Basically you will need to determine the figures that will appear in the borrower's title bill, listing all payments to be made at closing prior to release of the balance of funds to the borrower. Paragraph 2 is in reverse: our client, the depositor, must be indemnified if [] your firm's obligations as escrowee are not performed - - Stillwater will not be indemnifying your firm. Paragraph 3 should be struck, as it does not apply to this transaction.

Less than two hours later, Lynn Doss, the closing attorney, sent a reply to Prouty stating in part, "As to the escrow agreement. . . . in 22 years of practicing real

4

estate law, we have never had a request to prepare or execute such a document in order for lenders to tender funds. If there is something in particular that you want, send it to me and I will review it." Although Doss did not hear back from Prouty, Doss' paralegal, Tipton, sent an email to Prouty at 5:08 p.m. on December 20, stating: "Attached is the r[e]vised escrow agreement for your review. Let me know if you need something more specific." The attached escrow agreement included the changes requested by Prouty with regard to paragraph 2 and the listing of amounts to be paid off at closing.

On December 21st at 9:44 a.m., another New York attorney representing Stillwater, Stephen Semian, sent an email to Lynn Doss, copied to Tipton, that stated: "As far as I know, we are still waiting for your redraft of the escrow agreement, opinion, payoff letters and a list of liens that are being released (along with exact payoff amounts). Funds would arrive by wire - please send your wiring instructions to me, as I'll be preparing the direction letter." Tipton sent the following reply to Semian at 10:14 a.m.: "I sent everything to Allison [Prouty] on Wednesday about 330 or 400 p.m. I have attached the escrow agreement to this email for your review. If I need to add anything, please let me know."

5

At 1:31 p.m., Prouty sent an email to Lynn Doss stating: "The fourth email received from your office attached a revised escrow agreement. The most significant problem with this is that it provides that the entire balance of the loan proceeds will be released and paid to Mr. Carroll, who is not the borrower." At 4:38 p.m., Lynn Doss sent another email to Prouty attaching "the revised escrow agreement." The new revision corrected the error mentioned by Prouty in her email. Prouty testified that Doss ultimately "provided an escrow agreement that was acceptable." At another point in her deposition, she testified that the last version of the agreement "actually seemed to have most of the requirements I had asked for."

Semian sent an email at 8:00 p.m. on the evening of the closing (December 22), requesting Tipton to "send up a signed escrow agreement, but it is undisputed that neither Doss nor Stillwater signed any version of the escrow agreement. Semian testified that while a signed escrow agreement was "wanted before closing," he was not concerned that it was not signed before the closing on December 22nd, because they "had agreed on the final form of the agreement."

Lynn Doss testified that she did not sign the escrow agreement before the closing based upon an email she received from Prouty on December 21, 2006 at 5:17 p.m. Doss interpreted that email to mean that Stillwater was no longer insisting upon

6

a first position for the 48.2 acre tract as a condition for closing.[3] Doss also believed, based upon this email, that a subordination agreement from BB&T would no longer be a condition of closing and that Stillwater would address it after closing.[4] Based upon this understanding, the provision in the last version of the escrow agreement requiring her to obtain a first lien on all properties listed, including the 48.2 acre tract, "was obviously a mistake because there's nothing that indicates that they're paying off BB&T." She testified that she "presumed" Stillwater's counsel no longer wanted the escrow agreement when she received no further communication about it after sending the last revised draft. Although she testified that she asked Stillwater's counsel "to tell me if my draft escrow agreement was acceptable," her last email stated only: "Attached is the revised escrow agreement." Nowhere in her email does she ask if the last revised escrow agreement is acceptable.

---

[3] Prouty disputes Doss' interpretation of her email and contends that she was clearly referring to a different tract that was not part of the closing and for which no title had previously been examined.

[4] Prouty testified in her deposition that she was assured by Tipton on December 22, 2006 that Steve Carroll, who guaranteed the loan, had obtained the subordination agreement and would deliver it later that day. She further testified that she funded the loan based upon this representation.

7

1. "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." OCGA § 13-3-1.

> In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

(Citations and punctuation omitted.) *Turner Broadcasting System. v. McDavid*, 303 Ga. App. 593, 597 (1) (693 SE2d 873) (2010). Additionally,

> A formal, written agreement may be a condition precedent to the formation of a binding contract, when the parties so intend. When the parties intend to memorialize with a formal document an agreement that they have already reached, on the other hand, the execution of the document is not an act necessary to the creation of an enforceable contract."

(Citations omitted.) *Brooks Peanut Co. v. Great Southern Peanut*, Ga. App. (746 SE2d 272) (2013). Stated differently, "assent to the terms of a contract may be given other than by signatures." (Citations and punctuation omitted.) *Terry Hunt Constr. v. AON Risk Svcs*, 272 Ga. App. 547, 552 (3) (613 SE2d 165) (2005) (issue of fact as to whether course of dealing between parties demonstrated assent to agreement). And "assent may be implied from the circumstances," *Redmond & Co. v. Atlanta & Birmingham Air-Line R.*, 129 Ga. 133, 142-143 (2) (58 SE 874) (1907), and the conduct of the parties. *Tom Brown Contracting v. Fishman*, 289 Ga. App. 601, 603-604 (1) (658 SE2d 140) (2008).

Here, the record shows that Stillwater's attorneys informed Doss that an escrow agreement was required as a condition of the loan. Several draft agreements were provided by Doss, the last of which incorporated the revision requested by Stillwater's attorneys. The following day, Stillwater funded the loan, and this conduct can be construed as an assent to the last draft of the escrow agreement provided by Doss. While Lynn Doss asserts that she interpreted Prouty's 5:17 p.m. email, sent after the last version of the escrow agreement had been provided to Prouty, as rendering a portion of the escrow agreement "a mistake," she never communicated this belief to Stillwater's counsel or made any effort to withdraw or revise the last

9

version of the escrow agreement she had drafted. Moreover, Prouty testified that her 5:17 p.m. email was not inconsistent with the terms of the escrow agreement and that she was informed by Doss' paralegal that a subordination agreement, consistent with the terms of the escrow agreement, had been obtained before she authorized a wire of the loan funds into Doss' escrow account.

Because genuine issues of material fact remain as to whether there was a meeting of the minds with regard to an escrow agreement, the trial court erred by granting summary judgment in favor of Doss on Stillwater's claim for breach of the escrow agreement. See *Terry Hunt Constr.*, supra, 272 Ga. App. at 552 (3) (trial court erred by granting summary judgment because course of conduct between parties created issues of fact regarding assent to unsigned written agreement); *Computer Maintenance Corp. v. Tilley*, 172 Ga. App. 220, 222 (1) (322 SE2d 533 (1984) (physical precedent only) (issues of fact exist as to whether party that failed to sign contract ratified contract by subsequent conduct and performance).

2. Doss argues, in the alternative, that we should affirm the trial court's grant of summary judgment in its favor because, as a matter of law, Stillwater suffered no damages as a result of its second-position lien on the 48.2 acre tract. According to Doss, no loss occurred because Stillwater received $5.6 million as a result of its

foreclosure on the remaining tracts, an amount greater than the initial principal amount of the loan ($4.75 million). We disagree.

The deed to secure debt executed by Carroll provided: "in this Security Deed the definition of the Debt includes all the obligations and liabilities of Grantor under the Guaranty with respect to (i) the principal of the loans . . . , (ii) all accrued interest thereon . . ." It also provided that the security deed would be cancelled only after "payment of the Debt." Stillwater was therefore entitled to exercise its power of sale under the security deed to collect accrued interest on the loan, and its inability to first exercise a power of sale on the 48.2 acre tract to collect accrued interest of $2,158,920.80 resulted in a loss. See OCGA § 13-6-2 ("[d]amages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach").

For the above-stated reasons, we reverse the trial court's grant of partial summary in Doss' favor in Case No. A13A0990.

*Case No. A13A0989*

In this appeal, First American contends that the trial court erred by denying its motion for summary judgment on Stillwater's claims for coverage under the title

11

insurance policy and for bad faith damages under OCGA § 33-4-6. First American also contends that the trial court erred by granting summary judgment in favor of Doss on First American's claim for attorney fees under an indemnity agreement. For the reasons explained below, we reverse the trial court's denial of First American's motion with regard to its liability under the policy and liability for bad faith damages. We affirm with regard to Doss' liability for attorney fees under the indemnity agreement.

3. First American contends that Stillwater has suffered no loss under the policy, because the value of the other foreclosed tracts upon which Stillwater received a first-position lien totaled $5.6 million and the amount insured by the policy was $4.75 million. In essence, First American contends Stillwater suffered no loss within the meaning of the policy as a result of its failure to obtain a first-position lien on the 48.2 acre tract. Stillwater, on the other hand, asserts that the policy language is ambiguous with regard to how an insured's monetary loss under the policy is calculated and that the ambiguity must be construed against First American and in favor of coverage.

The cover page of the policy states that First American, subject to policy conditions, exclusions, exceptions, and stipulations, "insures, as of Date of Policy

12

shown in Schedule A, against loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the insured by reason of . . . [t]he priority of any lien or encumbrance over the lien of the insured mortgage." The policy does not define the term "loss or damage." The amount of insurance listed in Schedule A of the policy is $4.75 million. Schedule A also states: "The instruments creating the estate or interest in real estate which is hereby insured are described as follows: By that certain deed to secure debt, security agreement and assignment of leases from Steven W. Carroll to . . . Stillwater. . . ."

Section 7 (a) of the policy, under "Determination and Extent of Liability." provides:

(a) The liability of the Company under this policy shall not exceed the least of:

(i) the amount of insurance stated in Schedule A, or, if applicable, the amount of insurance as defined in Section 2 (c) of these Conditions and Stipulations;

(ii) the amount of unpaid principal indebtedness secured by the insured mortgage as limited or provided under Section 8 of these Conditions and Stipulations or as reduced under Section 9 of these Conditions and Stipulations, at the time of loss or damage insured against by this policy occurs, together with interest thereon; or

13

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy.

Section 9 of the policy, titled "Reduction of Insurance; Reduction or Termination of Liability," provides:

(a) All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto. However, any payments made prior to the acquisition of title to the estate or interest as provided in Section 2 (a) of these Conditions and Stipulations shall not reduce pro tanto the amount of the insurance afforded under this policy except to the extent that the payments reduce the amount of indebtedness secured by the insured mortgage.

(b) Payment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, or any voluntary partial satisfaction or release of the insured mortgage, to the extent of payment, satisfaction or release, shall reduce the amount of insurance pro tanto. The amount of insurance may thereafter be increased by accruing interest and advances made to protect the lien of the insured mortgage and secured thereby, with interest thereon, provided in no event shall the amount of insurance be greater than the Amount of Insurance stated in Schedule A.

(c) Payment in full by any person or the voluntary satisfaction or release of the insured mortgage shall terminate all liability of the Company except as provided in Section 2 (a) of these Conditions and Stipulations.

The trial court found "an ambiguity in the above [p]olicy language regarding whether the insurer's liability under the Policy is intended to include accrued interest on a loan, notwithstanding the insured's recovery of the principal loan amount."

For the reasons explained below, we conclude that First American was entitled to summary judgment in its favor on the issue of liability under the policy, but disagree with First American's contention that the policy limit was reduced below zero based upon the interplay between Section 7 (a) (ii) and Section 9 (b) of the policy. Specifically, First American asserts that *before* Stillwater foreclosed, the outstanding principal balance on its loan was $4.75 million, that Stillwater received $5.6 in the foreclosure sale of the parcels for which it received a first position lien, and that the principal balance of $4.75 million must be reduced by the $5.6 million in proceeds, resulting in a number less than zero.

Section 7 (a) (ii) states:

The *liability* of the Company under this policy shall not exceed the least of . . . *the amount of the unpaid principal indebtedness* secured by the insured mortgage as limited or provided under Section 8 of these

15

Conditions and Stipulations *or as reduced under Section 9* of these Conditions and Stipulations, at the time the loss or damage insured against by this policy occurs, together with interest thereon. (Emphasis supplied.)

The first sentence of Section 9 (b) provides that "[p]ayment in part by any person of the principal of the indebtedness, or any other obligation secured by the insured mortgage, . . . shall reduce *the amount of insurance* pro tanto." (Emphasis supplied.) Section 9 (b) provides a stand-alone method for the calculation of the *amount of insurance*, but the stated purpose for Section 7 of the policy is to provide for the amount the Company is *liable* for under the policy, not the *amount of insurance*.

Examination of the policy as a whole clarifies that the *amount of insurance* is not necessarily the amount which First American is *liable* to pay; nor is it necessarily the amount stated in Schedule A of the policy. Section 2 (c)[5] of the policy, referenced in a different portion of Section 7,[6] provides:

---

[5] Section 2 of the policy is titled "Continuation of Insurance" and subsection 2 (c) is titled "Amount of Insurance."

[6] Section 7 (a) (i) provides that one alternative calculation of First American's potential liability under the policy is "the amount of Insurance stated in Schedule A, or, if applicable, the amount of insurance defined in Section 2 (c) of these Conditions and Stipulations."

16

The amount of insurance after acquisition or after the conveyance shall in neither event exceed the least of:

(i) the amount of insurance stated in Schedule A;

(ii) the amount of the principal of the indebtedness secured by the insured mortgage as of Date of Policy, interest thereon, expenses of foreclosure, amounts advanced pursuant to the insured mortgage to assure compliance with laws or to protect the lien of the insured mortgage prior to the time of acquisition of the estate or interest in the land and secured thereby and reasonable amounts expended to prevent deterioration of improvements, but reduced by the amount of all payments made; or

(iii) the amount paid by any governmental agency or governmental instrumentality, if the agent or instrumentality is the insured claimant, in the acquisition of the estate or interest in satisfaction of its insurance contract or guaranty.

Section 9 (b), which provides a calculation for the amount of insurance, does not provide a calculation to reduce the amount of unpaid principal. Instead, it provides that principal, as well as interest,[7] paid under the policy will reduce the *amount of insurance*. The portion of Section 7 (a) (ii) stating "the amount of the unpaid principal

---

[7] The phrase "any other obligation secured by the insured mortgage" in Section 9 (b) would certainly include accrued interest.

indebtedness . . . as reduced under Section 9" therefore inexplicably references a formula for the reduction of the amount of insurance, not unpaid principal indebtedness.

In this case, even after taking into account the applicable rules of contract construction,[8] we conclude that Section 7 (a) (ii) is too vague and uncertain to be enforced. Simply put, the phrase at issue is incomprehensible and we are unable to articulate two alternate meanings for the language employed by First American when drafting Section 7 (a) (ii) of the policy.[9]

"An insurance contract will be deemed ambiguous only if its terms are subject to more than one reasonable interpretation. The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." (Citation and punctuation omitted.) *State Farm Mut. Auto. Ins. v. Staton*, 286 Ga. 23, 25 (685 SE2d 263) (2009). As this court has previously recognized, "[t]here is a difference between ambiguity, which imports doubleness and uncertainty of meaning,

[8] See, e. g., OCGA §§ 13-2-2 and 33-24-16.

[9] As one court has noted, "It is all too clear that contract language, while at times a great explainer, is at times a great obscurer. It is incumbent upon insurance companies to state clearly the perimeters of their coverage to those who entrust their security to them." *Ranger Ins. Co. v. Culberson*, 454 F.2d 857, 867 (III) (5th Cir. 1971).

18

and that degree of indefiniteness which imports no meaning at all." (Citations and punctuation omitted.) *A. S. Reeves & Co. v. McMickle*, 270 Ga. App. 132, 134 (605 SE2d 857) (2004).

> [A] word or phrase is ambiguous only when it is of uncertain meaning, and may be fairly understood in more ways than one. An ambiguity, then, involves a choice between two or more constructions of the contract. Where, as here, there is no ambiguity, and the terms of the contract are not set out with sufficient particularity to enable the court to say what in fact was intended by the parties as full compliance, then the matter of a choice between two or more constructions is not involved.

(Citations and punctuation omitted.) *Burden v. Thomas*, 104 Ga. App. 300, 302-303 (121 SE2d 684) (1961).

Having concluded that Section 7 (a) (ii) of the policy is too indefinite to be enforced,[10] we turn to whether First American has any liability under Section 7 (a) (i) or 7 (a) (iii) of the policy as it is liable for the lesser of the amounts calculated under

---

[10] The policy included the following severability clause: "In the event any provision of this policy is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision and all other provisions shall remain in full force and effect."

19

these subsections.[11] Under Section 7 (a) (iii), First American is liable for "the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy." Schedule A of the policy designates *all* of the parcels securing the loan as "[t]he Estate or interest in the land described herein and which is covered this policy." Here, the value of all of the parcels taken as a whole exceeds "the value of the insured estate or interest as insured subject to the . . . encumbrance." The insured value of the entire estate was $4.75 million and Stillwater received $5.6 million in proceeds from its foreclosure sale of the parcels in the insured estate for which it received a first position lien. As this amount is less than zero and First American is liable for the lesser amount under Sections 7 (a) (i) and (iii) of the policy, First American has no liability under the policy. The trial court therefore erred by

---

[11] Section 9 (b), standing alone after Section 7 (a) (ii) is severed from the policy, cannot be used to calculate First American's *liability* under the policy. As stated previously, Section 9 (b) only provides a calculation for a reduction in the amount of insurance. While Section 7 (a) (i) could be interpreted to include the amount of insurance calculated under Section 9 (b), it could be interpreted in the alternative as including *only* the amount of insurance stated in Schedule A or defined in Section 2 (c) of the policy. As any ambiguity regarding the interplay of Section 9 (b) and Section 7 (a) (i) must be construed against the insurer, Section 9 (b) should not be used to determine First American's liability under Section 7 (a) of the policy. See *State Farm Mut. Auto Ins. v. Staton*, 286 Ga. 23, 25 (685 SE2d 263) (2009).

20

denying First American's motion for summary judgment on Stillwater's claim for coverage under the title insurance policy and for bad faith damages under OCGA § 33-4-6. See *King v. Atlanta Cas. Ins.*, 279 Ga. App. 554, 557 (1) (631 SE2d 786) (2006) (insurer entitled to summary judgment on bad faith claim "when there is no evidence of unfounded reason for the nonpayment").

4. In its remaining enumeration of error, First American claims that the trial court erred by denying partial summary judgment in its favor with regard to Doss' liability under the agency agreement for attorney fees. We disagree.

Section 11 of the agency agreement between Doss and First American obligated Doss "to indemnify [First American] for all loss, cost or damage which [First American] may sustain or become liable for on account of" various acts. The trial court concluded that the phrase "all loss, cost or damage" did not include attorney fees, based upon its obligation to "strictly construe the contract against the indemnitee."

In Georgia, "attorney fees are not generally recoverable as damages absent an *express* provision in a contract or a statutory mandate." (Citations and punctuation omitted; emphasis in original.) *George L. Smith &c. v. Miller Brewing Co.*, 255 Ga. App. 643, 644 (566 SE2d 361) (2002). See also OCGA § 13-6-11 ("The expenses of

21

litigation generally shall not be allowed as a part of the damages.") Black's Law

Dictionary defines "express" as follows:

> Clear; definite; explicit; plain; direct; unmistakable; not dubious or ambiguous. Declared in terms; set forth in words. Directly and distinctly stated. Made known distinctly and explicitly, and not left to inference. Manifested by direct and appropriate language, as distinguished from that which is inferred by conduct. The word is usually contrasted with "implied."

(Citation omitted.) Black's Law Dictionary, p. 580 (6th ed. 1990).

In this case, one would have to infer that the phrase "loss, cost, or damage" also includes attorney fees, because the indemnity agreement does not set forth the words "attorney fees." See *National Minority &c. v. First National Bank*, 83 FSupp.2d 1200, 1205 (III) (B) (4) (D. Kan. 1999). We therefore conclude that the indemnity provision in the agency agreement did not expressly provide for attorney fees, and the trial court properly denied First American's motion for summary judgment on this issue. See id. at 1206 (B) (5); *Bowers v. Fulton County*, 227 Ga. 814, 816 (1) (183 SE2d 347) (1971) ("general rule is that attorney fees are not included in the term 'costs' or

22

'expenses' in the absence of some statutory provision, rule of court, or by contract of the parties"); *Georgia L. Smith II*, supra, 255 Ga. App. at 644.[12]

*Case No. A13A0988*

In this appeal, Doss contends that the trial court erred by granting partial summary judgment in favor of First American with regard to its claim of indemnity against Doss under the agency agreement. The trial court's summary judgment order states "that Doss has an obligation to indemnify First American for 'all loss, cost or damage,' other than attorneys' fees, incurred in the event of a judgment in favor of Stillwater against First American due to the failure of Stillwater to secure a first priority lien position in the 48.2 acre tract."

5. Doss contends that the trial court's ruling was premature because "genuine issues of material fact exist regarding Stillwater's claims against Doss" and because

---

[12] We note First American's reliance upon a federal decision concluding that an indemnity agreement encompassed attorney fees based on the phrases "any and all loss, cost, damage and expense" and "all loss, damage, and expense." *Brown v. Seaboard Coast Line R. Co.*, 554 F2d 1299, 1304 (III) (5th Cir. 1977). We are not persuaded by the 5th Circuit's interpretation, however, because it overlooked the long-standing Georgia rule that attorney fees cannot be recovered in the absence of an *express* contract provision and applied a *federal* rule interpreting indemnity agreements broadly with regard to the type of damages recoverable. See *Agulnick v. American Hosp. Supply Corp.*, 507 FSupp. 135, 137 (Mass. 1981) (noting "general interpretive rule in federal court that indemnity provisions will be broadly construed once the right to indemnification is established").

it could be forced to indemnify First American even if "Stillwater's claims against Doss are never proven." We disagree.

> The indemnity agreement required Doss
>
> to indemnify [First American] for all loss, cost or damage which [First American] may sustain or become liable for on account of: . . .
>
> > b. . . . (2) Failure of any commitment or policy issued by Agent or through Agent's office . . .
> >
> > (c)     to reflect an appropriate requirement or exception therein as to any lien, claim, encumbrance or other defect . . .
> >
> > (ii)     disclosed by the approved attorney's or title examiner's title report or opinion, or
> >
> > (iii)     known to Agent (including but not limited to matters not of record); unless Agent is expressly authorized in writing by [First American] to disregard same.

Contrary to Doss' argument, the plain language of this agreement does not require a judgment *against Doss* for its liability under the indemnity agreement to be established. Instead, it requires Doss to indemnify First American for *First American's liability* as outlined in the indemnity provision. Therefore, a finding of

Doss' liability to Stillwater is not the event which triggers its obligation to indemnify First American.

Here, the record shows, without dispute, that the title policy included the 48.2 acre tract, but did not include an exception for the first position BB&T mortgage. It also shows, without dispute, that Doss was aware of BB&T's first position lien. As Stillwater's claim against First American is predicated upon the existence of BB&T's first priority lien, the trial court did not err by concluding that Doss was obligated to indemnify First American in the event that Stillwater prevailed against First American on its claim under the policy. See *Superior Rigging &c. v. Ralston Purina Co.*, 172 Ga. App. 79, 80 (2) (322 SE2d 95) (1984) ("judgment fixing legal liability is not a condition precedent to recovery pursuant to a contractual indemnity clause"). We therefore affirm the trial court's grant of partial summary judgment in First American's favor on the issue of Doss' liability for indemnity under the agency agreement.

6. Doss' enumeration of error regarding its obligation to indemnify First American for bad faith damages under OCGA § 33-4-6 is rendered moot by our holding in Division 3 granting summary judgment in favor of First American on Stillwater's bad faith claim.

25

*Conclusion*

7. For the above-stated reasons, we affirm the trial court's grant of partial summary judgment in favor of First American against Doss with regard to its claim of indemnity under the agency agreement in Case No. A13A0988. In Case No. A13A0989, we reverse the trial court's denial of First American's motion for summary judgment with regard to its liability to Stillwater under the policy and its liability for bad faith damages. We affirm the trial court's grant of summary judgment in favor of Doss on the issue of Doss' liability for attorney fees under an indemnity agreement. In Case No. A13A0990, we conclude that genuine issues of material fact preclude summary judgment in favor of Doss on Stillwater's claim for damages under an oral escrow agreement.

*Judgment affirmed in Case No. A13A0988; affirmed in part, reversed in part in Case No. A13A0989; and reversed in Case No. A13A0990. Doyle, P. J. concurs fully and in the judgment only as to Div. 3 in Case No. A13A0989. McFadden, J., concurs fully and specially in Case No. A13A0989.*

A13A0988. DOSS & ASSOCIATES v. FIRST AMERICAN TITLE

    INSURANCE COMPANY, INC.

A13A0989. FIRST AMERICAN TITLE INSURANCE COMPANY

    v. DOSS & ASSOCIATES.

A13A0990. GEROVA ASSET BACKED HOLDINGS, L. P. v.

    DOSS & ASSOCIATES.


McFADDEN, Judge, concurring specially.

I concur fully in all but Division 3. I concur in the judgment in Division 3, but for a different reason. The insurance policy read as a whole reflects the parties' intent to insure Stillwater's interest in the real estate securing the underlying loan, not the benefit of its bargain with its underlying borrower. Properly construed, the policy limits Stillwater's coverage to the amount of the unpaid principal balance and specifies that the balance was to be reduced by the total amount of all payments made

on the debt – notwithstanding any agreement as between Stillwater and its underlying borrower for allocation of a portion to interest. Because the total amount Stillwater has received from those payments and from the foreclosure exceeded the initial amount of the principal, and so reduced the principal balance below zero, First American has no liability under the terms of the policy and consequently is entitled to summary judgment on Stillwater's claims both for coverage under the policy and for bad faith damages.

"The cardinal rule of contract construction is to ascertain the intent of the parties at the time they entered the agreement. If that intention is lawful and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical and arbitrary rules of contract construction." *Gonzalez v. Crocket*, 287 Ga. 430, 433 (696 SE2d 623) (2010) (citation omitted). This rule requiring us to give a contract "that meaning which will best carry into effect the intent of the parties," as with other pertinent rules of contract interpretation, must be applied before we can reach a conclusion concerning whether a contract has the required definiteness to be enforced. See *McLendon v. Priest*, 259 Ga. 59, 60 (376 SE2d 679) (1989).

"[W]henever possible, a contract should not be construed in a manner that renders any portion of it meaningless." *Schwartz v. Schwartz*, 275 Ga. 107, 109 (2)

(561 SE2d 96) (citations omitted). "The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part[.]" OCGA § 13-2-2 (4).

Viewed in its entirely, the policy in this case reflects First American's agreement to insure Stillwater for an amount no greater than the amount it lent to its underlying borrower, $4.75 million. Nothing in the policy indicates an intent to also insure Stillwater for the interest it expected to receive on that loan (the benefit of its bargain with its borrower). To the contrary, Section 9 of the policy provided that as Stillwater received payments from or on behalf of its borrower, the amount for which Stillwater was insured would diminish, even if, as between Stillwater and its borrower, those payments applied to interest or some other obligation associated with the loan rather than to the actual principal balance.

An understanding of this intent provides a context for construing Section 7, the portion of the policy regarding the amount of liability that First American would have as to any particular loss thereunder. Section 7 (a) (ii) pertinently provides that First American's liability "shall not exceed . . . the amount of unpaid principal indebtedness secured by the insured mortgage . . . as reduced under Section 9 . . . at the time [of] the loss or damage, . . . together with interest thereon." Regardless of

3

how the phrase "as reduced under Section 9" is construed, the language in Section 7 (a) (ii) unambiguously expresses the parties' intent that First American not be liable for more than the amount of the unpaid principal indebtedness.

And we must presume that the parties intended the phrase "as reduced under Section 9" to have some meaning. It is true that Section 9 addresses the amount of coverage provided by the policy as a whole, while Section 7 addresses First American's liability for particular claims. But both sections should be read to reflect the parties' intent not to extend coverage under the policy to the benefit of Stillwater's bargain. So the phrase "as reduced under Section 9" should be construed to mean that the calculations prescribed in Section 9 for determination of the coverage provided by the policy as a whole are to be adapted to calculation of First American's *liability* under Section 7 (a) (ii) for the particular claim at issue.

So regardless of the terms of the underlying agreement between Stillwater and its borrower, any payments on Stillwater's loan to the borrower should be deducted from the unpaid principal balance for purposes of calculating First American's liability under the policy. To the extent this construction requires us to modify the phrase "as reduced under Section 9" to accomplish the parties' intent, we may do so to avoid rendering the phrase meaningless. See OCGA § 13-2-2 (6) ("In extreme

4

cases of ambiguity, where the instrument as it stands is without meaning, words may be supplied.").

The reference to interest in Section 7 (a) (ii) does not alter this construction. Its placement within that subsection indicates that it pertains to interest on the amount First American owes to its insured – the unpaid principal indebtedness *as reduced.*

Here that unpaid principal indebtedness is zero. The foreclosure proceeds in this case constituted a payment on the loan. See *Balboa Life & Cas. v. Home Builders Finance*, 304 Ga. App. 478, 479 (1) (697 SE2D 240) (2010). At $5.6 million, those proceeds alone exceeded the amount of principal that Stillwater loaned to its borrower. It follows that, First American has no liability to Stillwater under Section 7 of the policy and is entitled to summary judgment thereon.